UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ARTHUR L. LOCHER, JR.,              :        Case No. 3:11-cv-412
                                    :
        Plaintiff,                  :        Judge Timothy S. Black
                                    :
vs.                                 :
                                    :
COMMISSIONER OF                     :
SOCIAL SECURITY,                    :
                                    :
        Defendant.                  :

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to supplemental security income ("SSI") and disability insurance

benefits ("DIB").  (*See* Administrative Transcript ("Tr.") (Tr. 8-24) (ALJ's decision))

**I.**

On December 6, 2006, Plaintiff filed applications for DIB and SSI.  (Tr. 8).

Plaintiff alleges a disability onset date of September 1, 2005 due to heart and back

problems and depression.  (Tr. 8, 11).  These claims were denied initially and upon

reconsideration.  (Tr. 8).

Plaintiff, his attorney, and a vocational expert appeared at a hearing in November

2009 before an ALJ (Tr. 8), after which the ALJ found Plaintiff not disabled because he

retained the residual functional capacity ("RFC")[1] to perform sedentary work[2] with the following additional limitations: he required the opportunity to alternate between sitting and standing as needed, and he was limited to simple tasks featuring minimal personal contacts and no production quotas. (*Id.*) The Appeals Council denied review, giving the ALJ's decision the effect of a final decision by the Commissioner of Social Security. (*Id.*) Plaintiff then commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (Tr. 7).

Plaintiff is 52 years old and has a tenth-grade education. (Tr. 10). His past relevant work includes working at an asphalt company, as a construction laborer, auto mechanic, parts clerk, and small engine mechanic. (Tr. 10-11). Plaintiff claims he stopped working because his employer thought he posed a safety risk. (*Id.*) Plaintiff maintains he cannot work now because he cannot stand for more than 15-20 minutes, he has to change positions due to back pain, his legs go numb, and he has difficulty bending. (*Id.*)

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.

---

[1]  A claimant's residual functional capacity ("RFC") is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).

[2]  Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 CFR § 404.1567(a). Walking and standing may be required occasionally. *Id.*

2.    The claimant has not engaged in substantial gainful activity since September 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: vertebral disorder of the lumbar spine; lumbar annular tear; chronic lumbar strain; coronary artery disease with residual effects of stenting; and adjustment disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following additional limitations: opportunity to alternate sitting and standing as needed; simple tasks featuring minimal personal contacts and no production quotas.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on November 2, 1960, and was 44 years old, which defined him as a younger individual, age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social
Security Act, from September 1, 2005, through the date of this decision (20
CFR 404.1520(g) and 416.920(g)).

(Tr. 12-24).

In sum, the ALJ concluded that Plaintiff was not under a disability and was

therefore not entitled to SSI or DIB.  (Tr. 24).

On appeal, Plaintiff argues that: (1) the ALJ erred in improperly assessing the

opinion of the treating physician; and (2) the ALJ erred by accepting the vocational

expert's flawed testimony.  The Court will address each argument in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability

finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this

review, the Court considers the record as a whole.  *Hephner v. Mathews,* 574 F.2d 359,

362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that

finding must be affirmed, even if substantial evidence also exists in the record upon

which the ALJ could have found plaintiff disabled.  The Sixth Circuit explained:

> The Commissioner's findings are not subject to reversal
> merely because substantial evidence exists in the record to
> support a different conclusion.  The substantial evidence
> standard presupposes that there is a "zone of choice" within
> which the Commissioner may proceed without interference
> from the courts.  If the Commissioner's decision is
> supported by substantial evidence, a reviewing court must
> affirm.  *Id.*

-4-

The claimant bears the ultimate burden to prove, by sufficient evidence, that he is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

## A.

The record indicates:

A December 4, 1998 MRI of the thoracolumbar spine showed mild anterior osteophyte formation at L2-3 and L3-4.  (Tr. 318).

A January 18, 1999 note indicated that Plaintiff attended occupational therapy from December 10, 1999-January 15, 2010.  (Tr. 316).

On October 17, 2000, Dr. Catherine Campbell diagnosed Plaintiff with lumbosacral strain.[3]  (Tr. 303).  She opined that Plaintiff could seldom bend/stoop, seldom twist, occasionally crouch/squat, seldom kneel, seldom crawl, never walk on uneven surfaces, and seldom climb.  (Tr. 305).  Dr. Campbell limited Plaintiff to lifting/pushing/pulling to 15 pounds occasionally, 10 pounds frequently, and 5 pounds continuously.  (*Id*.)

A May 2, 2001 MRI of the lumbar spine showed mild disc bulging present at L3-4

---

[3]    A lumbosacral strain is a ligament injury in the lower back.

and L4-5 with no transligamentous disc herniation and mild neural foraminal narrowing. (Tr. 299).

A January 26, 2004 x-ray of the lumbar spine showed degenerative changes that were mainly seen at L5-S1 and suggestion of mild vascular calcification of the distal aorta or proximal iliacs.  (Tr. 273).  There were also mild anterior endplate degenerative changes at L2-3.  (*Id*.)

A June 28, 2004 MRI of the lumbar spine without contrast revealed L5-S1 spondylosis, L5-S1 left foraminal disc herniation with lateral recess stenosis and foraminal stenosis, several Schmorl's nodes, and L5-S1 left lateral stenosis.  (Tr. 293).

A February 4, 2005 EMG study showed no abnormality seen in the left lower extremity and lumbar paraspinal muscles with nerve conduction velocities and distal latencies as normal.  (Tr. 271).  It was noted that Plaintiff may have had meralgia paresthetica.[4]  (*Id*.)

A May 12, 2005 x-ray of the chest showed no radiographic evidence of acute cardiopulmonary disease.  (Tr. 269).

Plaintiff was examined by Dr. James Lundeen on July 12, 2005 in regard to an industrial injury.  (Tr. 289-292).  He indicated that Plaintiff's physical limitations due to his injury included difficulty walking for long periods of time, bending over, and lifting. (Tr. 290).  Dr. Lundeen noted the pain was located in Plaintiff's lower back and elbows

---

[4]  Meralgia paresthetica is numbness or pain in the outer thigh not caused by injury to the thigh, but by injury to a nerve that extends from the thigh to the spinal column.

and that he experienced numbness, tingling, and burning in these locations.  (*Id.*)  Dr.
Lundeen reported that Plaintiff had restless sleep due to discomfort from his injuries and
activities which worsened his symptoms included working, bending over, walking,
standing, and lifting.  (*Id.*)  He noted that there were no activities or treatment that
alleviated his symptoms.  (*Id.*)  Dr. Lundeen stated that Plaintiff had a permanent partial
impairment, which in terms of percentage of the whole person, was 18%.  (Tr. 292).

On October 20, 2005, Plaintiff presented to Mercy Medical Center with complaints
of lumbar and left knee pain after a fall.  (Tr. 220).  An x-ray of the thoracolumbar spine
dated the same showed stable appearance of the thoracolumbar vertebrae with
degenerative changes most pronounced at the L2-3 level.  (Tr. 224).  An October 20,
2005 x-ray of the left knee showed a normal knee.  (Tr. 225).

On November 4, 2005, Plaintiff presented to Mercy Medical Center with
complaints of lumbar/low back pain and pain in the joint and lower leg.  (Tr. 214-15).  An
MRI of the left knee dated the same showed extensive bone bruising of the lateral aspect
of the knee joint and a possible undisplaced fracture or trabecular microfracture or the
lateral tibial plateau.  (Tr. 216).  There was also a sprain of the medial collateral ligament
but the lateral collateral ligament complex was intact.  (*Id.*)

Dr. Jamal Taha evaluated Plaintiff on December 2, 2005.  (Tr. 228-229).
Plaintiff's chief complaint was back/leg pain with symptoms starting about five years
prior and located in the low back around the right hip area.  (Tr. 228).  He noted the pain

radiated to bilateral leg anterior thighs and was associated with paresthesia in bilateral

leg.  (*Id*.)  Plaintiff reported his pain as severe and constant, and achy and throbbing in

nature.  (*Id*.)  He stated that his symptoms were aggravated by activity.  (*Id*.)  Dr. Taha

reviewed MRI lumbar spine images and reports, and diagnosed Plaintiff with lumbar disc

displacement without myelopathy.  (Tr. 229).  He indicated Plaintiff would undergo a

diskography of the L3/L4, L4/L5, L5/S1 region.  (*Id*.)

A December 16, 2005 CT of the lumbar spine with contrast showed annular

degeneration at all five levels with no definite annular tear or extravasation with no

mechanical central or exiting root compromise identified.  (Tr. 231).

A December 16, 2005 diskogram of the lumbar region showed Plaintiff's exact

back pain at the L2-L3, L3-L4, L4-L5, and L5-S1 levels.  (Tr. 233).  The L1-L2

provocative injection produced a pressure-type sensation without pain, which Plaintiff

described as new.  (*Id*.)

From January 22, 2004 to January 16, 2006, Plaintiff regularly treated with Dr.

Dean for low back pain.  (Tr. 234-267).  Dr. Dean continuously noted bilateral

lumbosacral spine tenderness and straight leg raise positive bilateral at 35 degrees.  (Tr.

234, 237, 239, 241, 244, 246, 248, 249, 252, 254, 256, 258, 260, 262, 265, 267).  He

diagnosed Plaintiff with back pain and lumbago-sciatica due to displacement of lumbar

intevertebral disc.  (Tr. 244, 246, 248, 250, 252, 254, 256, 258, 260).

A January 16, 2006 followup note from Dr. Taha referenced a diskogram positive

-8-

for L2-S1 discs. (Tr. 227). Dr. Taha did not recommend surgery based on these results, but instead referred Plaintiff to pain management. (*Id*.)

Dr. Andreas Syllaba reported in a March 1, 2006 letter that Plaintiff had an MRI that revealed disk bulging at multiple levels including L2-L3 and L3-L4 as well as spondylosis and disk herniation at L5-S1. (Tr. 282). He noted that he was asking for lumbar epidural blocks under fluoroscopy and intervertebral disk decompression therapy along with listed physical medicine modalities and therapeutic exercise for 20 treatments to be approved in Plaintiff's BWC claim. (*Id*.)

In an undated Statement of Medical Necessity, Dr. Syllaba noted Plaintiff had last been evaluated on April 12, 2006. (Tr. 281). He stated that Plaintiff continued to suffer from chronic lumbar pain and that a previous MRI revealed discogenic disease with positive discography at multiple levels as well as spondylosis L5-S1 with bilateral neuroforaminal narrowing. (*Id*.) Dr. Syllaba noted that the differential diagnoses of Plaintiff included lumbar facet syndrome, lumbar discogenic pain syndrome, and possible sacroiliac joint syndrome. (*Id*.) He opined that Plaintiff needed a lumbar epidural block and intervertebral disk decompression therapy. (*Id*.)

Dr. Syllaba indicated in a April 20, 2006 letter that Plaintiff had a diagnosis of lumbosacral strain and that concordant levels included L2-3, L3-4, L4-5, and L5-S1 correlating with annular degeneration seen at L1-2, L2-3, L3-4, L4-5, and L5-S1. (Tr.

280).  He believed Plaintiff to have lumbar facet syndrome,[5] annular disk bulging at L2-3, L3-4, as well as disk herniation at L5-S1 along with spondylosis aggravation.  (*Id*.)

Dr. Reddy indicated in a July 28, 2006, letter that Plaintiff was showing spondylosis at L5-S1 with neuroforaminal narrowing at L5-S1 along with intervertebral disk disease at L2-L3, L3-L4, and L5-S1.  (Tr. 277).  He noted that provocative diskography injection reproduced the patient's exact back pain at L2-L3, L3-L4, L4-L5, and L5-S1 level.  (*Id*.)  Dr. Reddy stated that Plaintiff suffered from lumbar facet joint syndrome and had enlarged disk bulging at L2-L3 and L3-L4 levels with disk herniation at L5 and S1.  (*Id*.)

Dr. Syllaba opined in a September 25, 2006 letter that Plaintiff had posttraumatic spondylosis, lumbar disk displacement L5-S1, annular tear L2-L3 and L3-L4, and herniated disk L5-S1 with lumbar diskogenic pain at the mentioned levels based on a previous diskogram.  (Tr. 276).

In a November 15, 2006 letter, Dr. Syllaba noted that Plaintiff's Bureau of Workers' Compensation claim had been approved for bilateral lateral epicondylitis and results of lumbosacral strain.  (Tr. 275).  He indicated that he was trying to add the diagnoses of posttraumatic spondylosis L5-S1, lumbar facet syndrome, and lumbar degenerative disk disease to the claim.  (*Id*.)  He stated that Plaintiff had severe pain as related to his industrial injury and the pain had not gone away.  (*Id*.)

---

[5]    Facet syndrome is a syndrome in which the zygapophysical joints cause back pain.

Dr. William Padamadan examined Plaintiff at the request of the Ohio Disability Determinations Service on February 7, 2007. (Tr. 366-373). Plaintiff's chief complaint was low back pain. (Tr. 366). A straight leg raise on supine position was 70 degrees and on sitting position was 80 degrees. (Tr. 368). Dr. Padamadan diagnosed Plaintiff with low back pain and prescription drug addiction. (*Id*.)

In a July 11, 2007 note to the Bureau of Disability Determination, Dr. Reddy reported Plaintiff's primary diagnoses as sprain/strain lumbosacral, bilateral lateral epicondylitis, lumbosacral spondylitits L5-S1, neuroforaminal narrowing, and intervertebral disc disease. (Tr. 374-375). Dr. Reddy noted that Plaintiff would benefit from injection therapy along with physical modalities to improve his function. (Tr. 375). He stated that Plaintiff was, at the present time, unable to work due to continued symptoms of pain and spinal mobility. (*Id*). Dr. Reddy indicated that Plaintiff's extension was limited because of facet joint arthrosis and his flexion was limited because of the herniated disc and degenerative disc disease along with provocative disc pathology. (*Id*.)

A July 26, 2007 x-ray of the chest showed no acute cardiopulmonary disease of interval change compared with a May 12, 2005 exam. (Tr. 389).

On July 27, 2007, Plaintiff underwent a left cardiac catheterization, selective coronary angiography, and left ventriculography. (Tr. 386-387).

On July 31, 2007, Plaintiff underwent a left cardiac catheterization, selective

-11-

coronary angiography, and PTCA and stent implantation of critical right coronary artery stenosis. (Tr. 377-378).

Dr. Daniel Hrinko performed a psychological evaluation of Plaintiff on August 8, 2007 at the request of the Bureau of Disability Determination. (Tr. 391-393). He diagnosed Plaintiff with adjustment disorder with depressed mood and assigned him a GAF of 55 with his highest GAF in the past year being 65.[6] (Tr. 392). Dr. Hrinko indicated that Plaintiff's ability to relate with coworkers and supervisors was moderately impaired due to psychological factors alone. (Tr. 393).

An August 8, 2007 report from Dr. T. Ahmed noted diagnoses of coronary artery disease ("CAD"), native vessel; angina;[7] precordial chest pain; tobacco abuse; chronic obstructive pulmonary disease; chronic systolic heart failure; abnormal MPI; status post coronary stent; and hypercholesterolemia. (Tr. 487-488). Dr. Ahmed reported that Plaintiff could not afford medications prescribed. (Tr. 458).

Dr. Todd Finnerty completed a Mental Residual Functional Capacity Assessment

---

[6] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. A score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). A score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[7] Angina is a chest pain or discomfort when the heart muscle does not get enough blood and is a symptom of CAD.

on August 20, 2007 at the Request of the Bureau of Disability Determination. (Tr. 395-398). He stated Plaintiff was moderately limited in the following areas: ability to work in coordination with or proximity to other without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; ability to ask simple questions or request assistance; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 395-396).

On December 27, 2007, Plaintiff underwent a left cardiac catheterization, selective coronary angiography of the left and right coronary arteries, left ventriculography, and selective right coronary artery angiography with Dr. S. Ahmed. (Tr. 471-472). Dr. Ahmed diagnosed Plaintiff with moderate disease of the right coronary artery with moderate in-stent restenosis and normal LV function. (Tr. 472).

A June 9, 2008 EMG showed no evidence of peripheral polyneuropathy in the lower extremities and very mild L5 radicular changes bilaterally. (Tr. 533-535).

A June 24, 2008 MRI of the lumbar spine without contrast revealed chronic Schmorl's node findings with degenerative disc disease L1 through S1 and worse at L2-L3 and L5-S1 with loss of disc height and accompanying facet arthropathy; L5-S1 Modic type 2 degenerative end plate changes; right L4-L5 and left L5-S1 mild to moderate

-13-

foraminal stenosis worse at L5-S1 with perhaps some contact with the left exiting L5

nerve root. (Tr. 531). It was noted that there was no definite central or existing nerve

compromise appreciated however with attention to the L3-L4 level with no definite

exiting L3 nerve root compromise to account for Plaintiff's anterior thigh pain. (Tr. 531).

A June 24, 2008 x-ray of the right knee showed negative left knee with medical

collateral ligament calcification possibly related to remote trauma. (Tr. 532). A clinical

history of lower back pain and tingling that radiated down to both knees was noted. (*Id.*)

From May 21, 2008 through September 17, 2008, Plaintiff underwent a series of lumbar

transforaminal epidural blocks. (Tr. 536-540).

Plaintiff treated with Dr. Latha Venkatesh from October 13, 2008 through August

21, 2009. (Tr. 569-581). Dr. Venkatesh treated Plaintiff for COPD, back pain,

depression, CAD, memory loss, tremors, and other common ailments. (*Id.*)

Dr. Jerry Flexman examined Plaintiff on March 6, 2009 for complaints of low

back pain. (Tr. 582-584). Plaintiff indicated that he had had back pain for the last eight

years and the pain in his back went down his legs causing numbness and tingling. (Tr.

582). Dr. Flexman noted that the results of his evaluation showed Plaintiff to be an

individual who appeared to be experiencing significant pain difficulties. (Tr. 583). He

opined that Plaintiff needed to be involved in psychotherapeutic intervention, as well as

put on some antidepressant medication. (*Id.*) Dr. Flexman noted that Plaintiff had had

some suicidal ideation in the past and he was concerned Plaintiff may become more

suicidal. (*Id.*)

-14-

Dr. Gewirtz saw Plaintiff in his office for a consultation at the request of Dr. Venkatesh on August 17, 2009. (Tr. 493-494). He noted Plaintiff's chief complaint was back pain. (Tr. 493). Dr. Gewirtz reviewed MRI and CT scans and noted that Plaintiff had multilevel degenerative changes throughout the lumbar spine with the worst level at L5-S1, but without any severe canal stenosis. (*Id.*) He also referenced an EMG report which reported a mild L5 radiculopathy, but that was consistent with an irritation symptom, not with any true compressive radiculopathy. (*Id.*) He noted that there was no good surgical option and recommended continued pain management. (Tr. 493-494).

Plaintiff regularly treated with Dr. Reddy at the Dayton Pain Clinic for low back pain from February 15, 2006 through October 28, 2009. (Tr. 324-365, 413-423, 495-529, 541-568). Plaintiff regularly described his low back pain as sharp, burning, tingling, and numbing. (*Id.*) He rated his pain level with medications on a scale of 1-10 as typically being between 5 and 8. (*Id.*) He commonly reported having muscle spasms, tingling, numbness, muscle aches, joint pains, and weakness, as well as hip pain. (*Id.*) He reported his sleep was interrupted due to his pain. (*Id.*)

Dr. Reddy completed a questionnaire at the request of Plaintiff's counsel on November 20 and November 23, 2009. (Tr. 586-592). He stated that Plaintiff's first office visit was February 15, 2006 and his diagnoses were L5 radiculopathy, L5-S1 spondylosis, L5-S1 left neuroforaminal narrowing, and degenerative disc disease at L2-3, L3-4, and L5-S1. (Tr. 586). Dr. Reddy reported that he had given Plaintiff several

-15-

lumbar epidural blocks. (Tr. 587). He opined that Plaintiff's chronic pain incapacitated

his ability to do any physically demanding work, and that he had exacerbations of pain

and would not be a reliable employee. (*Id.*) He noted Plaintiff's pain was a limiting

factor, and his low back pain was most problematic. (Tr. 588). The low back pain was

sharp and aching with burning and numbness in both legs. (*Id.*) He limited Plaintiff to

sitting less than 1 hour, standing less than 1 hour, and walking less than 1 hour. (Tr. 589).

He noted that Plaintiff's full capacity for combined sitting/standing/walking was 3-4

hours. (*Id.*) Dr. Reddy opined that Plaintiff could not comfortably sustain these activities

on a full-time basis. (*Id.*) He further limited Plaintiff to occasionally lifting 10 pounds,

and never lifting 20 or 50 pounds. (*Id.*) Plaintiff could occasionally carry 10 pounds, and

never carry 20 or 50 pounds. (*Id.*) Dr. Reddy reported that Plaintiff's capacity for

sedentary work was part-time for 2 hours. (Tr. 590). He noted Plaintiff had no capacity

for light work. (*Id.*) Dr. Reddy indicated Plaintiff could use his right and left hands for

simple grasping, pushing and pulling, and fine manipulation, but could only use both

hands for pulling or pushing 10 pounds occasionally. (*Id.*) He limited Plaintiff to

occasionally bending, twisting, and reaching above shoulder level; and never squatting,

kneeling, climbing stairs, and climbing ladders, scaffolding, etc. (Tr. 591). Dr. Reddy

indicated Plaintiff should avoid unprotected heights, working around machinery,

exposure to marked changes in humidity and temperature, work requiring substantial

outside activity in cold or rainy weather, and exposure to dust, fumes, or gases. (Tr. 591-

592). He opined that Plaintiff would require complete freedom to rest frequently without restrictions and would be absent due to exacerbation of conditions 5 or more days per month. (Tr. 592).

### B. Testimony

On November 24, 2009, Plaintiff testified that if he sat too long in a certain position, he had to keep constantly moving in different directions and shifting his weight from one hip to another. (Tr. 36). He stated that sometimes his legs would go numb, tingle, and burn. (*Id*.) Plaintiff reported that he stopped working in September 2005 because his boss thought it would not be good for him to continue working with his injured back because of safety reasons. (Tr. 37). Plaintiff testified that his biggest problem affecting his ability to work at a full-time job was his lower back. (*Id*.) He stated that he had problems standing and could not stand for more than 15 to 20 minutes, and had to keep constantly moving and shifting from one leg to another. (*Id*.) He reported that it was difficult for him to bend down and then lift himself back up, and that a lot of times he had to use his hands to help push himself back up. (*Id*.) Plaintiff indicated that he had two stents placed in his heart and that he had an enlarged heart which was at 40 percent working capacity. (Tr. 38). He stated that he took 13 medications every day. (*Id*.) Plaintiff indicated that he regarded himself as depressed. (Tr. 39). He stated that he could sit for an hour or so in a chair but he had to constantly keep moving around or his legs would begin to tingle and burn, and his thighs would

become numb and he would experience pain.  (*Id*.)  He reported that he could lift or carry maybe ten pounds occasionally.  (Tr. 40).  Plaintiff noted that he did not leave the house very much, and had no friends that he associated with.  (*Id*.)  He reported that he was not able to do the things that he used to do.  (Tr. 43).  Plaintiff indicated that his wife did the dishes and laundry for him.  (Tr. 46).  He stated that he had lost a lot of balance, his legs gave out, and that he had to constantly try to stay somewhere where he could grab ahold of something in case his legs gave out.  (*Id*.)  Plaintiff testified that he slept probably four to four and a half hours a night, interrupted.  (Tr. 47).  He stated he has had five set of injections in his back and each shot would help less and less.  (Tr. 54-55).

**B**.

Plaintiff alleges that the ALJ erred in improperly assessing the opinion of the treating physician.  Specifically, Plaintiff claims that Dr. Reddy's opinion should be given controlling weight.  Dr. Reddy has been Plaintiff's pain management doctor since at least February 15, 2006.[8]  (Tr. 324-365, 413-423, 495-529, 541-568).

A treating source is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527

---

[8]   Plaintiff filed applications for DIB and SSI on December 12, 2006, so Dr. Reddy had only been Plaintiff's doctor for ten months when he filed for disability.

(d)(2).[9]  *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical

opinions and diagnoses of treating physicians are generally accorded substantial

deference, and if the opinions are uncontradicted, complete deference.").  If a treating

physician's "opinion on the issue(s) of the nature and severity of [a claimant's]

impairment(s) is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

case," the opinion is entitled to controlling weight.  20 C.F.R. § 1527(d)(2).  When a

medical source opinion is not entitled to controlling weight, an ALJ will evaluate the

factors in 20 C.F.R. § 404.1527(d) (length, nature, and extent of treatment relationship;

supportability; consistency; and specialization) when determining the weight to give an

opinion.

The Social Security regulations recognize the importance of longevity of

treatment, providing that treating physicians:

> are likely to be the medical professionals most able to provide
> a detailed, longitudinal picture of your medical impairment(s)
> and may bring a unique perspective to the medical evidence
> that cannot be obtained from the objective medical findings

---

[9]  *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (One such
standard, known as the treating physician rule, requires the ALJ to generally give greater
deference to the opinions of treating physicians than to the opinions of non-treating physicians
because these sources are likely to be the medical professionals most able to provide a detailed,
longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique
perspective to the medical evidence that cannot be obtained from the objective medical findings
alone.).

> alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  A consultative physician's assessment does not constitute

*substantial evidence* so as to overcome the properly supported opinions of treating

physicians.  *Lashley v. Sec'y of Health & Human Services*, 708 F.2d 1048, 1054 (6th Cir.

1983).

In rejecting the opinion of the treating physician, the ALJ took "[s]pecific note" of

Plaintiff's testimony that he was "still able to play golf" and, even after his alleged onset

of disability, played four or five times in a summer, during which he could hit a ball about

175 to 200 yards.  (Tr. 21, 40, 43-44).  Additionally, treatment records reflect that despite

ongoing complaints of back pain, Plaintiff went mushroom hunting.  (Tr. 253).  Plaintiff

was also able to prepare simple meals, sweep, care for his dogs, shop, and water his

houseplants.  (Tr. 40-41, 66, 103, 105).  Plaintiff also appropriately dressed and groomed

himself for appointments, handled his own finances, and drove a car.  (Tr. 66).  The ALJ

reasonably considered Plaintiff's activities when evaluating his functional limitations.

*See* 20 C.F.R. § 404.1529(c)(3)(i).

Additionally, the ALJ noted that Plaintiff reported that his chest pain was

"fleeting" and he was able to relieve his pain by rubbing his chest and using nitroglycerin

sparingly.  (Tr. 21, 478).  Treatment records also reflect that Plaintiff's cardiac symptoms

were "not as bad" after stents were placed.  (Tr. 60).  With respect to Plaintiff's

musculoskeletal pain, the ALJ noted that Plaintiff "testified that the numbness and

-20-

tingling in his legs [wa]s only intermittent." (Tr. 21, 51). In addition, the ALJ observed

that there were "many times when he has said his mediation [wa]s working and his pain

[wa]s reduced." (Tr. 21, 236, 503, 515, 543). Treatment notes from Dr. Reddy's pain

clinic state that Plaintiff's "[p]ain levels are pretty well controlled [with] meds" (Tr. 515)

and that Plaintiff was "stable" on his current medication regimen with no side effects (Tr.

21, 543). The ALJ concluded that the control of Plaintiff's symptoms with medications,

and without side effects, was inconsistent with Dr. Reddy's opinion that Plaintiff could

not even perform sedentary work on a full-time basis. (Tr. 18-19).

With respect to his medical impairments, Dr. Padamadan found no objective basis

for functional limitations and indicated that Plaintiff had a prescription drug addition.

(Tr. 18, 368-69).[10] Additionally, examining neurosurgeon Dr. Gewirtz "did not find any

evidence of radiculopathy" (Tr. 493) and neurologist Dr. Taha noted that Plaintiff was not

a surgical candidate (Tr. 227). Accordingly, the ALJ concluded that Dr. Reddy's opinion

was not supported by the objective medical evidence. (Tr. 19).

Further, the ALJ considered Plaintiff's admission that he "stopped working for

reasons not related to the allegedly disabling impairments." As the ALJ explained,

Plaintiff "testified that he was laid off for safety reasons" and Plaintiff actually was able

to perform his work despite his back impairment. (Tr. 23, 37-38). Thus, the ALJ

---

[10]    Plaintiff's pain clinic progress notes indicated that he used marijuana and had an
addiction. (Tr. 522-23). Examining psychologist Dr. Flexman also noted "[s]ome chemical
dependency issues." (Tr. 583).

determined that Plaintiff's activities of daily living, the stability of his symptoms with medication, and his abilities at the time of his alleged onset of disability, support his conclusion that Dr. Reddy's opinion was inconsistent with the evidence and serves as "good reason" for giving the opinion less weight.  20 C.F.R. § 404.1527(d)(4) ("Generally the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Ultimately, the ALJ properly determined that while Plaintiff may have some functional limitations, the weight of the evidence does not establish that such an impairment would render him totally disabled.  Although the ALJ could have explained his assigned RFC more thoroughly, proof of disability is not overwhelming[11] and the ALJ's finding that Plaintiff is capable of sedentary work is supported by substantial evidence.   The issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence.  *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  Substantial evidence supports the ALJ's finding that Plaintiff was not disabled.

## C.

Next, Plaintiff maintains that the ALJ erred by accepting the vocational expert's ("VE") flawed testimony.

The ALJ posed the following hypothetical to the VE: sedentary work with the

---

[11]     While the ALJ's findings did ultimately fall between that of Dr. Reddy and Dr. Pasomadon, there is no evidence the ALJ simply split the difference.

ability to change positions at will, simple repetitive work, minimal personal contact, and no production of quotas. (Tr. 64-65). The VE testified that there would be 2,000 positions in the region that Plaintiff could perform. (Tr. 65). He gave examples of a polishing machine operator and wire insulator. (*Id*.)

The ALJ noted that "the sedentary exertion jobs identified by the vocational expert are representative of a significant number of jobs in the national economy." (Tr. 230). However, the jobs the VE cited were not sedentary jobs. The Dictionary of Occupational Titles assigns code 603.682-026 to the job of "polishing-machine operator (any industry)" which indicates the job's strength as medium. The job of wire insulator is also described as medium strength. Given these jobs examples, there is no way of knowing whether the 2,000 positions the VE referred to were actually sedentary jobs.

The Court in *Beinlich v. Comm'r of Soc. Sec*, 345 Fed. Appx. 163, 168 (6th Cir. 2009), held that "not all occupations are included in the DOT, and the VE may use terminology that differs from the terms used in the DOT." The claimant in *Beinlich* pointed out that some for the occupations named by the VE, actually exceeded the skill or exertional requirements of the claimant's RFC. *Id*. However, the Sixth Circuit held:

> the mere fact that the DOT does not list occupations with those precise terms does not establish that they do not exist . . . The ALJ may choose to reply on the VE's testimony in complex cases, given the VE's ability to tailor her finding to an "individual's particular residual functional capacity." *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003); *see also* SSR 00-4p (noting that "[t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific

settings.  A VE . . . may be able to provide some specific information about jobs or occupations than the DOT.").

*Id.*

An ALJ fulfills his duty by asking a VE whether there is a discrepancy between his opinion and the DOT, and "the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p."  *Id.*  Rather, "[t]his obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT."  *Id.  See also West v. Comm'r of Soc. Sec.*, No. 2:11cv448, 2012 U.S. Dist. LEXIS 107980 (S.D. Ohio Aug. 2, 2012) (holding that claimant waived a challenge to the basis of the vocational expert's testimony when his attorney did not challenge the VE's conclusions or identify a possible conflict between the VE's testimony and the DOT at the administrative level).  Moreover, the VE testified that the jobs of polishing machinery operator and insulator were simply examples of the approximately 2,000 sedentary jobs regionally that Plaintiff could perform.

Accordingly, the ALJ did not err in accepting the VE's testimony.

### III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Arthur L. Locher, Jr., was not entitled to disability insurance benefits and supplemental security income, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and,

-24-

as no further matters remain pending for the Court's review, this case is **CLOSED.**


Date:  2/7/13                                        _s/ Timothy S. Black_
                                                     Timothy S. Black
                                                     United States District Judge